**USX CORPORATION, Appellant,**

v.

**Javier SALINAS, et al., Appellees.**

**No. 04–89–00607–CV.**

Court of Appeals of Texas,
San Antonio.

Sept. 18, 1991.

Rehearing Denied Oct. 18, 1991.

474

Patrick P. Rogers, James W. Upton, Porter, Rogers, Dahlman, Gordon & Lee, Frank E. Weathered, Dunn, Cason & Weathered, P.C., Corpus Christi, for appellant.

Gary C. Riley, Davis & Davis, Austin, Raymond C. Alexander, Carlos Villarreal, Hunt, Hermansen, McKibben & Barger, Corpus Christi, Baldemar Gutierrez, Law Offices of Baldemar Gutierrez, Alice, Anthony F. Constant, Russell H. McMains, Kimberley Hall Seger, McMains & Constant, Corpus Christi, for appellees.

Before PEEPLES, BIERY and GARCIA,[1] JJ.

## ON APPELLANT'S MOTION FOR REHEARING AND APPELLEES' MOTIONS FOR REHEARING

BIERY, Justice.

This court's opinion of June 19, 1991, is withdrawn and the following opinion is substituted. The motions for rehearing of Advanced Petroleum, Javier Salinas, and Luther Durden are denied. The motion for rehearing of USX concerning indemnity against Advanced Petroleum is granted. The remainder of the USX motion for rehearing is denied.

This is a products liability case involving a defectively made hydraulic cylinder which resulted in the collapse of the oil rig elevator of which the cylinder was a part. The plaintiffs chose to try the case on a market-ing defect theory (failure of the retailer to warn that slippage of the elevator indicated potential collapse) rather than a manufacturing defect theory.[2] We reverse the trial court's judgment against USX and the dismissal of Advance, and remand for a new trial. We affirm the default judgments against the manufacturers, Newport and Christopher.

The plaintiffs-appellees, Javier Salinas and Luther Durden, were oilfield workers employed by Dixilyn Drilling. In October of 1985, both men suffered serious injuries when the oil well servicing rig elevator in which they were riding fell thirty feet to the ground. In addition to the plaintiffs and their employer, the other parties involved are as follows:

(1) Newport Hydraulics Incorporated, the manufacturer of a defective hydraulic cylinder which was an integral part of the oil rig elevator and which was found to have caused the elevator to fall;

(2) CC Services, Inc. d/b/a Christopher Manufacturing Company, the manufacturer and assembler of the oil rig elevator;

(3) Advanced Petroleum Services Inc. a/k/a Advanced Products & Systems, Inc., the exclusive wholesale distributor for Christopher Manufacturing;

(4) U.S.X. Corporation (USX), appellant, the retailer of the oil rig package, including the elevator and possibly the replacement cylinder;[3] and

(5) Highlands Insurance Co., the workers' compensation carrier which intervened as subrogee.

Salinas and Durden brought suit against Newport, Christopher, Advanced, and USX alleging a products liability marketing de-

---

1. Justice Garcia replaced Chief Justice Cadena in January, 1991.

2. Manufacturing defect cases involve products which are flawed and as a result, do not conform to the manufacturer's specifications and are not identical to their mass-produced counterparts. *Ford Motor Co. v. Pool*, 688 S.W.2d 879, 881 (Tex.App.—Texarkana 1985), *aff'd in part on other grounds, rev'd in part on other grounds*, 715 S.W.2d 629 (1986). The manufac-turing defect theory is based upon a consumer expectancy that a mass-produced product will not differ from its counterparts in a manner which makes it more dangerous than the others. *Id.*

The evidence in this case seems to be undisputed that the Newport cylinder was defectively manufactured.

3. There is disagreement, however, as to whether USX was the retailer for the replacement hydraulic cylinder which proved to be defective.

fect in the elevator and replacement cylinder. The plaintiffs non-suited defendant, Advanced Petroleum, on the first day of trial, and default judgments were entered against defendants Newport and Christopher, who failed to appear for trial.[4] After trial, judgment was entered against USX, and damages were awarded to both plaintiffs for their injuries. The trial court also denied USX's motion for indemnity from co-defendants Christopher and Advanced Petroleum.

The jury found that both the rig package and the replacement elevator cylinder were marketed in a defective condition (failure to warn) which was the producing cause of the plaintiffs' injuries. On appeal, USX challenges the trial court's judgment on the basis that: 1) the court erred in excluding a portion of Gordon Christopher's deposition testimony concerning the elevator's condition at the time it left his possession; 2) the pleadings did not support a strict liability theory for a "component rig package"; 3) the evidence was legally and factually insufficient to support the jury's affirmative answers to the liability questions; 4) liability could not be found against USX because it was not involved with the marketing of the replacement cylinder; 5) USX should have been granted indemnity from Christopher and Advanced; and 6) the evidence was legally and factually insufficient to support the disfigurement damages to both plaintiffs.

The elevator was a part of a component rig package which Dixilyn Field, the plaintiffs' employer, had ordered from USX in 1982. USX ordered the elevator from Advanced Petroleum who in turn ordered the elevator from Christopher Manufacturing. Christopher Manufacturing shipped the elevator directly to Dixilyn Field. When Dixilyn began to assemble the rig, it determined that the elevator shaft was too short for the space provided by the elevator because of its decision to place the rig's power supply underneath the elevator. Because the power supply placement shortened the space available for the hydraulic cylinder, a shorter cylinder was needed. The record indicates that the shorter replacement cylinder, manufactured by Newport Hydraulics, was ordered by Dixilyn directly from Christopher Manufacturing. USX admits that it was involved in the marketing of the elevator and its original cylinder but denies any involvement in the marketing of the replacement cylinder.

The elevator was used by the crew on the oil rig for approximately three years. During the last year and a half, the crew observed some slippage of the elevator cage and reported it to their supervisors. The supervisors told the crew that it was probably the hydraulic cylinder leaking but reassured them that the elevator was safe to use. After the accident, Gordon Christopher, the manufacturer of the elevator, determined that the accident was caused by the failure of a set screw to be tightened inside the replacement cylinder manufactured by Newport Hydraulics.

In point of error one, USX asserts that the trial court erred in excluding from evidence portions of the October 1988 deposition testimony of Gordon Christopher. This testimony, according to the appellant, would have shown that the elevator was neither defective nor unreasonably dangerous at the time it left the possession of Christopher Manufacturing, and such evidence was highly relevant regarding the most contested issue of fact before the jury. The trial court excluded this testimony, because of the failure of Christopher Manufacturing to answer requests for admissions about liability for the accident, stating that because these admissions were deemed admitted, a party could not bring out any contradictory testimony.

In making its decision to exclude the evidence, the court relied on *Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex.1989), which states that "[a]n admission once admitted, deemed or otherwise, is a judicial admission, and a party may not then introduce testimony to controvert it." The problem

---

**4.** A complete review by the jury of responsibility for the accident would have required the participation at trial of Newport and Christopher.

arises because Gordon Christopher occupies dual roles. On the one hand, he is the president and sole owner of Christopher Manufacturing, a party to this suit, and on the other he is an individual called as an expert witness by the plaintiffs-appellees.

USX asserts that the deemed admissions were attributable only to Christopher Manufacturing and not to Mr. Christopher individually, and even arguably if they were imputable to Christopher in his individual capacity, the excluded testimony was not offered by either Christopher Manufacturing or Mr. Christopher individually. Instead, the evidence was offered by the defendant USX which clearly could not be bound by the deemed admissions.[5] In addition, because Mr. Christopher was originally called as an expert witness, the excluded testimony was more in the nature of cross-examination.

In support of its contention, USX relies on *Krasa v. Derrico*, 193 S.W.2d 891 (Tex. Civ.App.—San Antonio 1946, no writ), which held that the failure of the defendant to answer requests for admissions could not be taken against the defendant in her two other representative capacities because the admissions were addressed to her individually. Further, it is well settled that deemed admissions resulting from one defendant's failure to respond to the requests may not be imputed to a co-defendant nor are they binding upon the latter due to their hearsay nature. *Texas Supply Center, Inc. v. Daon Corp.*, 641 S.W.2d 335, 338 (Tex.App.—Dallas 1982, writ ref'd n.r.e.). This rationale is found to be even more compelling under circumstances where the party to whom the requests were made does not respond to them. *Id.*

We conclude that the testimony was admissible. Next we address whether the exclusion was harmful error. To obtain a reversal of a judgment which is based upon error of the trial court in the admission or exclusion of the evidence, the following must be shown: 1) that the trial court did in fact commit error; and 2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). Reversible error for erroneous rulings on admissibility of evidence will not ordinarily be found where the evidence in question is cumulative and not controlling on a material issue dispositive of the case. *Id.*

USX asserts harmful error in the failure of the court to allow in the following evidence from Gordon Christopher's October 28, 1988, deposition:

Q. At the time the elevator left your possession on or about January 31st of 1982 was anything defective about the elevator? Is that [sic] was it considered not safe for normal handling and use?

A. No it had tested out good and it was, was not defective when it left my yard.

Q. Now with respect to the elevator that left your possession on or about January 31st of 1982, was it defective?

A. No, sir.

Q. With respect to the elevator that left your possession January 31st of 1982 was it unreasonably dangerous?

A. No, sir.

However, the record shows that the following questions and answers from the October 28, 1988, deposition of Gordon Christopher were allowed in on direct examination by USX:

Q. At the time or prior to the time that the elevator in question was delivered to Dixilyn Field did your company test the elevator?

---

5. The Plaintiffs' Requests for Admissions were sent to Christopher Manufacturing Company by and through its attorney of record and included the following:

Request 1: Admit that the cylinder was defective at the time it left the possession of Christopher Manufacturing Company.

Request 2: Admit that such defective condition was a producing cause of the occurrence in question.

Request 3: Admit that the elevator was defective at the time it left the possession of Christopher Manufacturing Company.

Request 4: Admit that such defect was a producing cause of the occurrence in question.

Request 5: Admit that Javier Salinas suffered physical injuries in the occurrence in question.

Request 6: Admit that Luther Durden suffered physical injuries in the occurrence in question.

A. Yes we did.

Q. And what were the test results with regard to that elevator?

A. They were good.

Q. At the time that you tested the elevator was there anything unsafe about the elevator?

A. No.

Q. Based on your test results with if original hydraulic cylinder, [sic] based on your test results was the original hydraulic cylinder this any way defective [sic], that is not safe for normal handling and use.

A. No.

Q. Based on your inspection and observations of the hydraulic cylinder that you removed from the elevator, would it be your opinion that the sole cause of the occurrence from the from an [sic] equipment standpoint would be because the head did not have a set screw tightened down as it should have been?

A. Yes sir.

Appellees offered the following portions of the deposition:

Q. Now with respect to the original hydraulic cylinder that is the hydraulic cylinder on the elevator when it left your possession January 31st of 1982 was it defective?

A. No, sir.

Q. Now with respect to the original hydraulic cylinder that is the hydraulic cylinder that was on the elevator January 31st of 1982, was it unreasonably dangerous?

A. Repeat that again Pat.

Q. With respect to the original hydraulic cylinder that is the hydraulic cylinder that was on the elevator January 31st of 1982, when it left your possession, was it unreasonably dangerous?

A. No, sir.

Q. With respect to the elevator that left your possession on or about January 31st did that elevator operate according to the specifications of C.C. Services Inc. d/b/a Christopher Manufacturing Company?

A. Yes, sir, yes it did.

Q. Now due to the fact that this case— now due to the fact that this case the facts in this case have established that Dixilyn Field did replace or substitute the original hydraulic cylinder with Cylinder 4923, would it be true that the elevator that left your possession January 21st of 1982 was not the identical elevator but the same component parts on October 29th of 1985?

A. Yeah. It didn't have some of the original parts on it that's true.

Q. Would that include the cylinder?

A. Yes.

Q. And the cylinder is the heart of the elevator.

A. That's true. It's called the hydraulic elevator and that's the heart.

Q. So if you were changing one heart for another heart would you make be making a substantial change?

A. Well yeah I would say so.

Comparing the three questions excluded by the court and the portions of the deposition allowed in, it appears that the three questions were cumulative and the error, if any, was harmless. *Reina v. General Acc. Fire & Life Assur. Corp.*, 611 S.W.2d 415, 417 (Tex.1981) (excluded testimony elicited from other witnesses by direct or cross-examination); *Delaporte v. Preston Square, Inc.*, 680 S.W.2d 561, 564 (Tex. App.—Dallas 1984, writ ref'd n.r.e.). Point of error one is overruled.

In point of error two, USX contends the trial court erred in submitting question 1 of the charge because there was no pleading to support strict liability for a "component rig package." Appellant contends that instead of using the term "component rig package," the court should have phrased the question using either "elevator" or "replacement cylinder" because in Plaintiffs' Fifth Amended Petition, on which they went to trial, all references were to the "elevator" and the component part of the elevator, the "hydraulic cylinder."[6] USX

6. Plaintiffs' Fifth Amended Petition made the following allegations:

contends that, over objection, plaintiffs-appellees recharacterized the product as a "component rig package." After the close of evidence, plaintiffs realized their pleadings did not support a component rig package theory and requested permission to file a trial amendment. Although the court denied plaintiffs' trial amendment request, it did allow the submission of the case in terms of the "component rig package." USX claims that it was prejudiced because the variance was substantial in that it took them by surprise because it prepared for trial on the basis of a defective elevator and component part and not a component rig package. USX claims the prejudice is also apparent in the trial court's denial of innocent retailer indemnity from Advanced Petroleum due to the implicit finding that USX was independently culpable because the product was the component rig package and not the elevator sold by Advanced which was merely a part of the package. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 432 (Tex.1984); R. McMains, *Contribution and Indemnity Problems in Texas Multi–Party Litigation*, 17 ST. MARY'S L.J. 653, 668 (1986) (right of indemnity restricted to cases of no independent liability findings and right of indemnity preserved for downstream *innocent* supplier of defective product from upstream supplier, manufacturer, or designer).

▆▆▆ In a strict liability action, the defendant is entitled to "fair notice" from the plaintiff's pleadings as to the identity of the product the plaintiff intends to litigate. *See Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 186 (Tex.1972); TEX.R.CIV.P. 47. A party must recover on the right in which he sues and upon proof of the facts stated in his pleadings, and he cannot recover through a right not asserted. *Huddleston v. Pace*, 790 S.W.2d 47, 50 (Tex. App.—San Antonio 1990, writ denied); *Jay Fikes & Assoc. v. Walton*, 578 S.W.2d 885, 889 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.). A variance between pleadings and proof, however, has rarely been the source of harmful error. *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 937 (Tex.), *cert. denied*, 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). To be reversible error, the variance must be substantial, misleading, constitute surprise, and be a prejudicial departure from the pleadings. *Id.* at 938. Under strict liability, violation of a seller's duty involves only a specific product. The litigation issue is limited to the specific product and its condition when sold. *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519, 529 (Tex.Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.). A defendant has a right to assume that the product, as identified by the pleadings and the evidence, is the only product it will be called upon to defend. *See Westinghouse Electric Corp. v. Pierce*, 153 Tex. 527, 271 S.W.2d 422 (1954).

In *Bell Helicopter*, 594 S.W.2d at 519, the threshold question concerned the identity of the product being litigated, a 102 series tail rotor system installed in a helicopter. The court found that the suggested characterization of the product, by Bell, as merely being the blade which broke was artificial and of little analytical value.

1. Defendant USX sold the *elevator* in question, whose failure caused the plaintiffs' injuries, and USX is therefore responsible for the plaintiffs' injuries under the theory of strict products liability (Emphasis added.)

2. Defendant CC Services, Inc. d/b/a Christopher Manufacturing Company, manufactured and sold the elevator which contained the defective hydraulic cylinder which caused the accident to defendant Advanced Petroleum Services.

3. Defendant Newport Hydraulics manufactured and sold a component part of the elevator, the component which failed and caused the injuries.

4. Defendant Advanced Petroleum sold the elevator containing the defective hydraulic cylinder that caused the accident.

5. Plaintiffs are entitled to recover their damages from defendants under the theory of strict products liability because the products in question were defectively designed, defectively manufactured, and defectively marketed. Further, the defendants knew or should have known of the risk of harm to users of their product. The defendants breached their duty to warn of such risk and this lack of warning rendered the product defective, the defect rendering the products unreasonably dangerous, and the defects were a producing cause of plaintiffs' injuries and damages.

Likewise, the broad characterization of the product as including not only the blade and helicopter, but also all relevant product information accompanying the sale of the helicopter was also artificial and wholly improper. The court held that the product in issue was the 102 series system, the system which failed to perform on the day in question, and the issues using the 102 series system term had been properly submitted to the jury. *Id.* at 529.

■ We find, however, that the terms "elevator" and "rig package" were used interchangeably throughout the trial. In fact, James Makins, an engineer for USX, defined the term "rig package" as used to designate a collection of equipment, units, and components that were to go into a designated rig, and USX sold a rig package to Dixilyn Drilling. In addition, during voir dire both the plaintiffs' and defendant's counsel referred to the defective product as a "rig package." We find that the submission of the first issue using the term "component rig package" was not a substantial or misleading variance and did not constitute a prejudicial departure from the pleadings as between the plaintiffs and USX. Point of error two is overruled.

■ In points of error three and four, USX contends the evidence was legally and factually insufficient to support the jury's affirmative answers to questions 1 and 1a of the charge.[7] In reviewing legal and factual sufficiency points, the standard of review is that the appellate court in considering a "no evidence" or legal sufficiency point can consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Glover v.*

*Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965) In considering a factual sufficiency point, we assess all the evidence and reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Jones v. Tarrant Util. Co.,* 638 S.W.2d 862, 866 (Tex.1982). It may resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses. *Webb v. Jorns,* 488 S.W.2d 407, 411 (Tex. 1972). In considering and weighing the evidence, we may not substitute our judgment or opinion for that of the jury. *Pool,* 715 S.W.2d at 634; *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796 (1951).

■ Question 1 of the charge read as follows: "Was there a defect in the marketing of the component rig package at the time it was sold by the United States Steel Corporation that was a producing cause of the injuries in question." A marketing defect occurs when a defendant knows or should know of a potential risk of harm presented by the product but markets it without adequately warning of the danger or providing instructions for safe use.[8] *Bristol–Myers Co. v. Gonzales,* 561 S.W.2d 801, 804 (Tex.1978); *Crocker v. Winthrop Laboratories,* 514 S.W.2d 429, 433 (Tex. 1974); E. CARSTARPHEN, *Product Defects,* in 2 TEXAS TORTS AND REMEDIES § 41.01[2] (J. Edgar & J. Sales eds. 1991). A marketing defect cause of action

---

**7.** Point of error five asserts that the judgment based upon questions 1 and 1a was erroneous as a matter of law because USX was not involved with the marketing of the replacement cylinder. Points of error three and four address the legal sufficiency issues and will include a discussion concerning the replacement cylinder.

**8.** The other two types of defects are a manufacturing defect and a design defect. A manufacturing defect exists when a product does not conform to the design standards and blueprints

of the manufacturer and the flaw makes the product more dangerous and therefore unfit for its intended or reasonably foreseeable uses. A product with a design defect complies with all design specifications, but the design configuration is unreasonably dangerous in that the risks of harm associated with its intended and reasonably foreseeable uses outweigh its utility. E. CARSTARPHEN, *Product Defects,* in 2 TEXAS TORTS AND REMEDIES § 41.02[2] (1991).

consists of five elements: 1) a risk of harm that is inherent in the product or that may arise from the intended or reasonably anticipated use of the product must exist; 2) the product supplier must actually know or reasonably foresee the risk of harm at the time the product is marketed; 3) the product must possess a marketing defect; 4) the absence of the warning and/or instructions must render the product unreasonably dangerous to the ultimate user or consumer of the product; and 5) the failure to warn and/or instruct must constitute a causative nexus in the product user's injury. Sales, *The Duty to Warn and Instruct for Safe Use in Strict Tort Liability*, 13 ST. MARY'S L.J. 521, 524 (1982) [hereinafter *The Duty to Warn*]. Therefore, in a marketing defect case, the injured plaintiff must raise a fact issue on the question of whether a warning or instruction should have been provided. Franklin, *Products Liability—Problems of Proof*, in STATE BAR OF TEXAS ADVANCED PERSONAL INJURY LAW J(A)–17 (1988). The four types of dangers which require a warning are: (1) a risk or danger inherent in the design of the prod-uct;[9] (2) foreseeable dangers or risks of harm from unintended uses of a product; (3) risks or dangers that affect only a limited number of users susceptible to a danger in the product; and (4) unavoidably unsafe products.[10] Sales, *Product Liability Law in Texas—1989*, in STATE BAR OF TEXAS ADVANCED PERSONAL INJURY LAW L–19 (1989). A product supplier has no duty to warn of dangers that are of common knowledge to the public or generally known to the consuming public. *Blackwell Burner Co., Inc. v. Cerda*, 644 S.W.2d 512 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.). The rationale behind this limitation is that no recovery right exists when the party to be warned is already aware of the danger. *Dougherty v. Santa Fe Marine, Inc.*, 698 F.2d 232, 235 (5th Cir.1983). Additionally, a product supplier is not liable for a failure to warn of dangers which were unforeseeable at the time the product was marketed. *Gross v. Black & Decker, Inc.*, 695 F.2d 858, 866 (5th Cir.1983). Therefore, the plaintiff must show that the product supplier *knew* or *should have known* of the risks *at the time of marketing*.[11] *Gideon v. Johns-*

---

**9.** Products in this category are high-risk products such as vehicles, chemicals, and heavy industrial machinery. The potential for serious harm in using the product is determinative in establishing the duty to provide a warning and adequate directions and instructions for safe use. *The Duty to Warn*, 13 ST. MARY'S L.J. 521, 531 (1982); *see Hamilton v. Motor Coach Industries*, 569 S.W.2d 571 (Tex.Civ.App.—Texarkana 1978, writ ref'd n.r.e.).

**10.** Products in this category are unsafe even though made in the manner intended, contain no impurities, and are marketed in the condition planned. *The Duty to Warn*, 13 ST. MARY'S L.J. 521, 539–40 (1982). Most of the unavoidably unsafe products involve drugs. *Id.* at 540.

Neither appellant nor appellees favor us with an analysis of which of these categories gave rise to a duty to warn on the part of USX and we express no opinion thereon.

**11.** There is some authority, although it does not appear to be the Texas view, that one way of determining whether the condition of the article is defective is to assume that the defendant knew of the product's propensity to injure as it did, and then to ask whether, with such knowledge, something should have been done about the danger before the product was sold. AMER-ICAN LAW OF PRODUCTS LIABILITY 3D § 33.5 (1987). In this analysis, the scienter is supplied as a matter of law, and there is no need for the plaintiff to prove its existence as a matter of fact. Thus, a manufacturer may be liable for failing to warn of dangers which were undiscoverable at the time of manufacture. It is of no import whether the manufacturer's warning comported with the warning that a reasonably prudent manufacturer would have given, and a manufacturer's inability to know or to prevent a risk is no defense in a strict liability case. *Id.*

Although the Texas Supreme Court has not definitively decided this issue, Texas courts have apparently adopted foreseeability and the time-of-sale approach. W. POWERS, TEXAS PRODUCTS LIABILITY LAW § 5.0342 (1991). The comments by the Committee on Pattern Jury Charges state that the duty to warn is "limited to dangers that are either known or by the application of reasonably developed human skill and foresight should have been known by the seller when the product was marketed and to uses that are either intended or reasonably foreseeable." 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 71.06 (1990). The Fifth Circuit has interpreted Texas law to require foreseeability in warnings cases. *Carter v. Johns-Manville*, 557 F.Supp. 1317 (E.D.Tex.

*Manville Sales Corp.*, 761 F.2d 1129, 1145 (5th Cir.1985); W. POWERS, TEXAS PRODUCTS LIABILITY LAW § 5.047 (1991). Foreseeability is measured in terms of those dangers which are reasonable to anticipate, and the product supplier is held to the status of an expert and is assumed to possess knowledge of the latest scientific advances.[12] The duty to warn is often established by expert testimony regarding the nature of the product and the foreseeability of the danger. Sales & Perdue, *The Law of Strict Tort Liability in Texas*, 15 HOUS.L.REV. 49, 50 (1977). Ways in which a plaintiff may prove knowledge or foreseeability of danger include: (1) evidence of similar accidents or other complaints; (2) presentation of post-accident warnings; (3) presentation of recall letters; (4) evidence of governmental standards; (5) expert testimony, lay testimony, or documentary evidence to show information about risks available to defendant; and (6) reliance on well-established presumptions.[13] Franklin, *Products Liability—Problems of Proof*, in STATE BAR OF TEXAS ADVANCED PERSONAL INJURY LAW J(A)–17–18 (1988); J. POWERS, TEXAS PRODUCTS LIABILITY LAW § 5.047 (1991). The record does not reflect any evidence in categories (1), (2), (3) or (4).

In response to the foreseeability element, appellees cite the supreme court case of *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 351 (Tex.1977), *overruled on other grounds, Turner v. General Motors Corp.*, 584 S.W.2d 844 (Tex.1979) and *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (1984), in which the court stated:

His liability is not rested upon what he knew or should have known when he manufactured or sold the product; it rests on his placing into the stream of commerce a product which is demonstrated at trial to have been dangerous. The damaging event may not have been reasonably foreseeable at the time of manufacture or sale because the dangerous factor of the product might not then have been even reasonably knowable.

A review of the *Hopkins* case reveals that the defect in issue was a design defect and not a marketing defect.[14] Citing *Hopkins*, the Waco Court of Appeals recently reiterated the distinction between design defect cases and failure to warn cases when it said "[W]hat the manufacturer knew or should have known is relevant to the defense of unforseeable misuse *and* in determining whether the manufacturer had a duty to warn of potential danger from the product's use." *John Deere Co. v. May*, 773 S.W.2d 369, 373 (Tex.App.—Waco 1989, writ denied) (emphasis added). Faced with the issue of foreseeability, the court in *Carter v. Johns–Manville Sales Corp.*, 557 F.Supp. 1317 (E.D.Tex.1983), recognized that foreseeability was not a factor in determining whether a product had a design defect because design defects are judged according to a product's risks as they are known at the time of trial. The court went on to hold that a product is defective due to a failure to warn *only* if the product dangers were foreseeable to the manufacturer *at the time the product was sold. Id.* at 1319 (emphasis added); Powers, *Torts—*

1983); W. POWERS, TEXAS PRODUCTS LIABILITY LAW § 5.0342 (1991). The requirement that the plaintiff must prove the product defect in strict liability prevents manufacturers from becoming absolute insurers of their products.

Because alleged manufacturing, design and marketing defects are often tried together, there is sometimes a lack of clarity among the nuances of the three different theories.

**12.** There is some support for the proposition that the position in the distribution chain affects the kind of information one is likely to have about the product and the ability to disseminate that information. Kidwell, *The Duty to Warn: A Description of the Model of Decision*, 53 TEXAS L.REV. 1375, 1399–1400 (1975).

**13.** A well established presumption exists that the injured party would have read and heeded a proper warning had one been given. *Magro v. Ragsdale Bros., Inc.*, 721 S.W.2d 832, 834 (Tex. 1987); *Technical Chemical Co. v. Jacobs*, 480 S.W.2d 602, 606 (1972). There is no dispute that the supervisor testified that had he been given a warning he would have heeded it and no evidence was presented to rebut this presumption. However, this presumption is applied when reviewing sufficiency of *causation* evidence. *Magro*, 721 S.W.2d at 834.

**14.** As noted at the outset of this opinion, plaintiffs pursued only a marketing defect theory and not a manufacturing defect theory.

*Personal,* 38 SW. L.J. 1, 7 (1984). The court explained that:

> Unlike the design defect case and manufacturing defect case, in which the shift in focus in response to the emergence of strict liability was rapid and smooth, the failure to warn case never made the transition in Texas, and remains in something of a legal anomaly.... In Texas, however, a product may be defective and unreasonably dangerous *due to failure to warn* of the dangers involved in using it only if the dangers were foreseeable to the manufacturer at the time it marketed the product. (citing *Bristol–Meyers Co. v. Gonzales,* 561 S.W.2d 801, 804 (Tex. 1978); *Crocker v. Winthrop Laboratories,* 514 S.W.2d 429, 433 (Tex.1974); *Rawlings Sporting Goods v. Daniel,* 619 S.W.2d 435, 439 (Tex.Civ.App.—Waco 1981, writ ref'd n.r.e.) and *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1090 (5th Cir.1973), *cert. denied,* 419 U.S. 869 [95 S.Ct. 127, 42 L.Ed.2d 107] (1974).

*Carter,* 557 F.Supp. at 1319. The court recognized the test for determining whether a product is defective and unreasonably dangerous due to a lack of warning is indistinguishable from the negligence test but "[a]s there is no indication that the Texas Supreme Court would overrule its prior holdings which infuse the negligence concept of foreseeability in the law of strict liability, this Court follows the law as clearly stated in those prior holdings, as it must." *Id.*

 In the present case, plaintiffs-appellees relied almost exclusively on the expert testimony of Gordon Christopher to prove their marketing defect case. Mr. Christopher, also the president of the corporation which manufactured the elevator, testified via two other depositions (other than the October 1988 deposition previously discussed). One deposition was taken in July of 1988, and the other in March of 1989. It is undisputed that at the time of the July 1988 deposition, Mr. Christopher was unaware that the original hydraulic cylinder had been replaced by a cylinder ordered directly from Christopher Manufacturing.[15] In Mr. Christopher's July deposition, he testified that he examined the elevator after the accident. He explained that the accident occurred because the piston head had backed off the piston rod. He stated that a "phillips headed set screw" was to go through the piston head and if the set screw had been properly tightened at the time of *manufacture,* this accident would not have happened. Mr. Christopher also stated that he purchased the cylinder from Newport Hydraulics, and the cylinder arrived in a completely assembled container. He stated he tested every elevator before it left his company. Mr. Christopher agreed that the cylinder was defective, and the defect was present at the time of purchase. Based on this information, Mr. Christopher further agreed that the elevator was in a defective condition and unreasonably dangerous when it left his possession. He also agreed that the unreasonably dangerous condition was a producing cause of the accident. He stated that *if he had had some way of knowing* that the set screw was not tightened at the time he sold the elevator, he would not have used the cylinder in that condition. He also stated that this accident was the first and only time that he ever had a Newport cylinder that did not have its set screw tightened properly. He is certain that the cylinder he saw in Alice after the accident was defective. He stated he did his best to make sure he shipped out a safe product and was proud of his products.

In the second deposition, Mr. Christopher stated that a slippage, leaking down or slipping down of the elevator during use indicates that the elevator might contain a leaking cylinder and could fail to perform as intended, but at the time he sold the elevator, *he did not know nor could he have foreseen* that using the elevator dur-

---

**15.** The second deposition of Mr. Christopher begins with dialogue concerning the question of whether or not the hydraulic cylinder originally placed in the elevator was the same cylinder in the elevator at the time of the accident. For the second deposition, it was judicially admitted by the plaintiffs that the original hydraulic cylinder in the elevator at the time it left Christopher Manufacturing on January 31, 1982, was removed by Dixilyn Field Drilling Company.

ing such slippage would indicate the elevator was failing to function properly and could result in serious injury. He also stated *he saw no reason to warn of such slippage and had no idea* that slippage would result in what happened to the elevator.

Later in the trial, more of Mr. Christopher's deposition was offered into evidence. This portion of the March deposition revealed the plaintiffs' judicial admission concerning the replacement of the hydraulic cylinder. Mr. Christopher stated he tested the elevator and received favorable test results, and based upon the favorable results, he determined that the original cylinder was not defective or unsafe for normal handling and use. Christopher once again repeated the account of his inspection of the elevator following the accident. He stated that the head did have a set screw but the screw had not been tightened and set, and the untightened screw was the *sole cause* of the accident. He further stated that he had no information that USX was the seller or vendor of the replacement substitute cylinder. He stated that the original hydraulic cylinder that left his plant was not unsafe, not defective, nor was it unreasonably dangerous. In addition, the elevator operated according to the specifications of Christopher Manufacturing.

In regard to the cylinder, Mr. Christopher explained that the cylinder was like the heart of the elevator because without it, the elevator would not function. He recognized that the cylinder could be referred to as a substantial component part of the elevator. He was not contacted by USX or Advanced Petroleum concerning Dixilyn's removal of the original cylinder. His records reflect that he paid $1,795 to Newport Hydraulics for the replacement cylinder and if there had been anything wrong with the original cylinder, he would not have paid for the replacement. He also has no record of Dixilyn Field complaining to him concerning the original cylinder. He stated that because the cylinder was the heart of the elevator, changing one cylinder for another would constitute substantial change. He said there was noth-

ing unsafe about the elevator when it left his possession. He stated that he tested the elevator and based on the test results, the original cylinder was not defective or unreasonably dangerous. He testified that had anything been wrong with the original cylinder he would have shipped it back to Newport. He averred that he knew of no complaints about the original cylinder and that none of the other elevators he manufactured and sold had slippage problems or had caused serious injury due to slippage.

Both plaintiffs-appellees testified that they were aware of the slippage for at least a year. Mr. Salinas testified that the elevator would slip when it was by itself at the top, and everyone on his crew knew about the slippage. Mr. Durden testified that he refused to use the elevator for seven days, and the others on his crew used their discretion in deciding whether or not to use the elevator. He stated that John Gloca reassured them it was safe. Mr. Durden said that he knew slippage was not normal and knew there was a problem with slippage. The slippage increased as time passed and during the last six months before the accident, he noticed the elevator slipping down between six to twelve feet.

Mr. John Gloca, the assistant drilling superintendent for Dixilyn Drilling, testified that he knew the elevator had been slipping for about a year and a half, and that everyone suspected the pressure relief valve was leaking. The valve was checked, some leakage found, but the elevator continued to slip. He also stated that if he had been given a warning about slippage, he would not have continued to use the elevator and would have replaced the cylinder.

Mr. Makins, a mechanical engineer for USX, admitted during his testimony that the cylinder in the elevator on October 29, 1985 (the date of the accident), was unreasonably dangerous. He testified that USX did not include any warnings or instructions which told the user that if the elevator slipped down while not in operation, it may fail and cause serious bodily injury or death. He said USX received no warnings from Advance Petroleum or Christopher Manufacturing concerning slippage or that

slippage indicated a manufacturing problem with the hydraulic cylinder which could cause the elevator to fail and cause injury or death. He testified that to his knowledge and experience, a slipping down of the elevator could be the result of other causes and not solely the result of a hydraulic cylinder failure. Mr. Makins testified that the instruction manual USX received from Advanced had been forwarded to Dixilyn Drilling; and that USX did not sell or order the replacement cylinder that was on the elevator at the time of the accident.

Plaintiffs-appellees contend the testimony of their expert, Mr. Christopher, that a slippage during use of the elevator indicated that it might contain a leaking cylinder and could fail to perform, and the testimony of USX's engineer, that if the elevator kept slipping for a year and a half it would be unreasonably dangerous to continue to use that elevator, constitutes sufficient evidence of foreseeability of knowledge of slippage in general. We agree that there was some evidence to support the jury's finding and, therefore, overrule the no evidence argument. Because of no other evidence, however, about similar accidents or complaints, post-accident warnings, recall letters or governmental standards, we are not persuaded that the jury's finding in Question 1 was supported by factually sufficient evidence to prove the downstream retailer *knew* or *should have known* of the risks *at the time of marketing*. *See Aluminum Co. of America v. Alm,* 785 S.W.2d 137, 139 n. 2 (Tex.), *cert. denied,* —— U.S. ——, 111 S.Ct. 135, 112 L.Ed.2d 102 (1990). The mere fact that an accident happens is not sufficient proof that the product was defective. *Rodriguez v. Ed Hicks Imports,* 767 S.W.2d 187, 192 (Tex.App.—Corpus Christi 1989, no writ). We sustain point of error number three.

 In question 1a of the charge, the jury was asked "Was there a defect in the marketing of the replacement elevator cylinder that was a producing cause of the injury in question?" It is a fundamental principle of products liability law that the plaintiff must prove that the defendant supplied the product which *caused* the injury. *Gaulding v. Celotex Corp.,* 772 S.W.2d 66, 68 (Tex.1989) (emphasis added). The seller is subject to liability only if the product when introduced into the channels of commerce is "in a defective condition, unreasonably dangerous to the user." *O'Neal v. Sherck Equip. Co., Inc.,* 751 S.W.2d 559, 562 (Tex.App.—Texarkana 1988, no writ). It was undisputed that the elevator fell because of the failure of a set screw to be tightened inside the replacement cylinder of the elevator. In addition, the plaintiffs admitted that the replacement cylinder which failed was obtained from Christopher Manufacturing in April of 1982. However, appellees assert that the following colloquy between the attorney for USX and Mr. Makins supports an inference that USX was involved with the marketing of the replacement cylinder:

Q: In connection with the sale of the elevator, are there any records which indicate that [USX] Oil Well Division had anything to do with the sale of the replacement cylinder?

A: No.

Q: Did Oil Well Division, USX Corporation, U.S. Steel Corporation, sell or order the replacement cylinder that was on the elevator at the time of that accident in question?

A: No.

Q: In connection with the exchange procedures discussed by [the plaintiff's attorney], *if* a piece of equipment was delivered to, for example in this case, Dixilyn Field and Dixilyn Field wanted to make a change in the rig structure that required a change in the cylinder and that there was nothing wrong with the cylinder, nothing functional wrong with the cylinder, what would be the procedural policy followed *if* Dixilyn Field would have come to Oil Well Division.

A: *If* Dixilyn had inquired as to the availability of alternate stroke length cylinder or something like that, Oil Well [USX] *would have gone back* to Advanced Petroleum to inquire if such was available ...

Q: Advanced *would have gone up,* for example, to Christopher?

A: I presume so, yes. (Emphasis added).

While we fail to see how these questions and hypotheticals support an inference that the replacement cylinder was ordered *directly* from USX, nevertheless, a supplier may have a duty to warn of dangers resulting from the removal and *replacement* of a component part during maintenance or servicing of the product.[16] *See Stewart v. Scott–Kitz Miller Co.,* 626 P.2d 329 (Okla. Ct.App.1981) (necessity for removing bolts and possibility of replacing backwards foreseeable); *Bich v. General Electric Co.,* 27 Wash.App. 25, 614 P.2d 1323 (1980) (duty to warn not to substitute fuse of another manufacturer required). The duty to warn, even in terms of *replacement,* continues to depend upon the foreseeable manner and environment of the use of the product. *The Duty to Warn,* 13 ST. MARY'S L.J. 521, 584–85 (1982). Although some evidence was presented that the cylinders would eventually have to be replaced due to wear,[17] the evidence as set out in point of error three was factually insufficient to show that it was foreseeably necessary to warn of replacement cylinder slippage. To support its contention that no evidence was presented as to the replacement cylinder, USX relies on this court's recent opinion in *Walton v. Harnischfeger,* 796 S.W.2d 225 (Tex.App.—San Antonio 1990, writ denied). We find *Walton* to be distinguishable, however, in that it was a summary judgment case in which the al-

---

**16.** An alteration must be substantial in order to relieve the manufacturer or seller of liability, and not every change made to a product after it leaves the manufacturer will suffice to preclude liability. 3 AM LAW PROD LIAB 3D § 43:5 (1987). Generally, only alterations or modifications not reasonably foreseeable by the manufacturer or seller are sufficient to preclude imposition of liability. 3 AM LAW PROD LIAB 3D § 43:16 (1987); *see Ford Motor Co. v. Russell & Smith Ford Co.,* 474 S.W.2d 549, 556 (Tex.Civ. App.—Houston [14th Dist.] 1971, no writ). Whether the alteration was substantial will frequently present a fact question. 63 AM. JUR. 2D *Products Liability* § 551 (1984). If the subsequent alteration is substantial, the burden is on the plaintiff to establish that it was objectively foreseeable that the alteration of the product would create a risk of injury; subsequent alterations are objectively foreseeable where in light of the general experience within the industry at the time the product was manufactured, they could have been reasonably anticipated by the manufacturer. 3 AM LAW PROD LIAB 3D § 43:16 (1987). If a manufacturer or assembler surrenders possession and control of a product in which change will occur, or in which change can be anticipated to occur so as to cause a product failure, the existence of a defect at the time the product left the manufacturer or seller is established. *Sharp v. Chrysler Corp.,* 432 S.W.2d 131, 136 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.) (a manufacturing defect case in which suit was brought against the manufacturer and the downstream distributors). Thus, it may be possible for the original retailer to foresee the occurrence of a defectively manufactured replacement part. Under the Model Uniform Product Liability Act, an alteration occurs whenever a person or entity other than the product seller changes the design, construction, or formula of a product, or changes or removes warnings or instructions that accompanied or were displayed on the product. MODEL UNIFORM PRODUCT LIABILITY ACT § 112[D][1] (1979). In Illinois, an alteration, modification, or change includes one made in the original recommendations, instructions, and warnings accompanying a product, but does not include replacement of a component part with a substitute having the same formula or design. 3 AM LAW PROD LIAB 3D § 43:4 (1987); *see Wells v. Web Machinery Co.,* 20 Ill.App.3d 545, 315 N.E.2d 301 (1st Dist.1974) (strict liability imposed on manufacturer and distributor of punch press for injuries sustained when replacement switch failed which was designed to be used interchangeably with original switch, relied on theory of design defect because machine would not stop when switch failed). Substantial change or alteration is defined in the Texas Pattern Jury Charges as meaning "that the configuration or operational characteristics of the product are changed or altered by affirmative conduct of some person in a manner that the defendant could not have reasonably foreseen would occur in the intended or foreseeable use of the product. Substantial change or alteration does not include reasonably foreseeable wear and tear or deterioration." 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 70.05 (1990). However, if the injury is caused by a substantially altered product as the result of the alteration rather than a defect existing at the time of manufacture, the manufacturer is not liable for the injury. 3 AM LAW PROD LIAB 3D § 43:6 (1987).

**17.** Normal wear and deterioration do not constitute a defect for the purposes of strict tort liability. T. TAYLOR & L. TAYLOR, *General Principles of Products Liability,* in 2 TEXAS TORTS AND REMEDIES § 40.02[3][b] (1991).

leged defective nylon strap was *not* a component part, unlike the hydraulic cylinder in this case, of the crane whose manufacturer was being sued. Point of error four is sustained. Point of error five concerning the no evidence point with regard to the marketing of the replacement cylinder is overruled.

In points of error seven and eight, USX contends that the evidence was legally and factually insufficient to support the jury awards regarding disfigurement damages to both plaintiffs, and in the alternative, the disfigurement awards were excessive.[18] The amount of damages suffered is a fact issue to be determined by the jury and should not be disturbed on appeal if supported by sufficient evidence. *Murphy v. Waldrip*, 692 S.W.2d 584 (Tex. App.–Fort Worth 1985, writ ref'd n.r.e.). In determining the sufficiency of the evidence, the appellate court must accept the jury's resolution of any conflicts or inconsistencies in the evidence. *Pool*, 715 S.W.2d at 629. A jury's findings on damages will not be disturbed on appeal on grounds of excessiveness if there is any probative evidence to sustain the award. *Tri–State Motor Transit Co. v. Nicar*, 765 S.W.2d 486, 491 (Tex.App.—Houston [14th Dist.] 1989, no writ).

Evidence supporting the award for disfigurement included Dr. Swan's testimony that Mr. Durden cannot stand straight, and the injury will continue to cause him to walk with a flat-foot stiff gait. As to Mr. Salinas' injuries, Dr. Swan testified that his injuries have caused arthritis in his ankles which will require ankle fusion, his mobility will be limited, and he will have stiff ankles. We find there was sufficient evidence to support these awards. *See Goldston Corp. v. Hernandez*, 714 S.W.2d 350, 353 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). Points of error seven and eight are overruled.

In point of error six, appellant contends that the court erred in refusing to grant it indemnity from Christopher Manufacturing and Advanced Petroleum. Appellant claims that it was merely an innocent "downstream" supplier of the elevator and was in no way involved with the sale of the replacement cylinder. Appellee Advanced Petroleum responds that USX had the burden to obtain jury findings that Advanced breached a duty it owed to USX, and that USX had to prove that Advanced knew or should have known that the component rig package and/or the replacement cylinder was dangerous.

Indemnity is an all or nothing proposition and means that a tortfeasor, who has been unjustly enriched at the expense of another tortfeasor, is obligated to indemnify the other tortfeasor. Keeton, *Annual Survey of Texas Law*, 34 SW.L.J. 1, 16 (1980). The common law doctrine of indemnity between joint tortfeasors in strict liability cases was impliedly abolished in *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984). *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 819 (Tex.1984). However, an indemnity right survives in products liability cases to protect the *innocent* retailer in the chain of distribution. *Id.;* McMains, *Contribution and Indemnity Problems in Texas Multi–Party Litigation*, 17 ST. MARY'S L.J. 653, 668 (1986) (*Duncan* specifically preserves the right of a downstream *innocent* supplier of a defective product to indemnity from the upstream supplier and/or manufacturer/designer of a defective product). As stated in *Duncan,*

> Comparative causation does not affect the right of a retailer or other member of the marketing chain to receive indemnity from the manufacturer of the defective product when the retailer or other member of the marketing chain is merely a conduit for the defective product and is not independently culpable. If there is no allegation of independent liability, the liability of the members of the marketing chain should be submitted as one. The jury will determine the causation attributable to the defective product.

---

18. USX admits that both men were injured and suffered pain, anguish and physical impairment. As to the disfigurement awards, Luther Durden received $80,000 for disfigurement, and Javier Salinas received $40,000 for disfigurement.

*Duncan,* 665 S.W.2d at 432. The breach of duty between tortfeasors set out in *Austin Road Co. v. Pope,* 147 Tex. 430, 216 S.W.2d 563 (1949), and relied upon by plaintiffs has been replaced with the comparative fault scheme as the way to apportion damages. *UMC, Inc. v. Coonrod Elec. Co., Inc.,* 667 S.W.2d 549, 554 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.) (citing *Duncan*); Carstarphen & Taylor, *Preservation of Indemnity Rights Among Strictly Liable Tortfeasors,* 48 TEX.B.J. 268, 274 (1985) (imaginary lawsuit test of *Austin Road Co.* dead). Under *Duncan,* the test for determining whether a right to indemnity exists is to determine whether the marketing chain member (USX) is merely a conduit for the defective product and not independently culpable. *Duncan,* 665 S.W.2d at 432; Carstarphen & Taylor, *Preservation of Indemnity Rights Among Strictly Liable Tortfeasors,* 48 TEX. B.J. 268, 274 (1985). The alleged indemnitor (Advanced), however, apparently must submit separate questions to establish the seller's independent culpability and must submit the seller's percentage of causation as a separate entry in the percentage comparison question to defeat the indemnity claim of one claiming to be a mere conduit (USX).[19] W. DORSANEO & C. ALDER, *Contribution and Indemnity,* in 4 TEXAS TORTS AND REMEDIES § 102.05[3][c] (1991). None of the issues submitted in this case established independent culpability or percentage of causation on the part of USX.[20]

Even though Advanced Petroleum was nonsuited, the record clearly reflects that Advanced Petroleum participated in the trial of the case. There is no evidence that USX was *independently* culpable with re-

spect to the product in question and clearly demonstrates that USX was an innocent retailer conduit of the product from the upstream suppliers, Advanced and Christopher. We hold that USX is entitled to indemnity from Advanced and Christopher.

Accordingly, the default judgments in favor of the plaintiffs against Newport and Christopher are affirmed. The judgment in favor of the plaintiffs against USX is reversed and remanded for a new trial. Judgment is rendered that USX is entitled to indemnity from Advanced and Christopher. The judgment in favor of the intervenor, Highlands Insurance Company is reversed and remanded.

---

19. The case of *Traveler's Ins. Co. v. United States,* 283 F.Supp. 14, 31 (S.D.Tex.1968) has been cited for the proposition that the burden is on the one seeking indemnity to submit the proper issue. Gallagher & Holman, *Contribution and Indemnity in Texas* in STATE BAR OF TEXAS ADVANCED PERSONAL INJURY LAW K–30 (1988). A review of the *Traveler's* case reveals that that decision was concerned only with the contribution issue and made no reference to indemnity. *Traveler's,* 283 F.Supp. at 31.

USX also cites *R.B. Tractors, Inc. v. Mann,* 800 S.W.2d 955 (Tex.App.—San Antonio 1990, no writ) and the cases cited therein for the

proposition that the burden was on Advanced (the indemnitor) to disprove USX's right to indemnity. While instructive, we do not find *R.B. Tractors, Inc.* and the cases cited therein to be controlling because those cases involve contractual indemnification and the "clear and unequivocal" test or the "express negligence" rule.

20. This may be due to the fact that a default judgment was taken against defendants Christopher Manufacturing and Newport Hydraulics who failed to appear, and a nonsuit taken against Advanced Petroleum before the case was submitted to the jury.