CATERPILLAR, INC. and B.D. Holt Company, Appellants,

v.

Cipriano SHEARS and Irene Shears, Individually and as Next Friend of Cipriano Shears, Jr. and Claudia Shears, Appellees.

No. 13–92–010–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 25, 1994.

Rehearing Denied Sept. 22, 1994.

Kenneth S. Geller, James D. Holzhauer, Javier H. Rubinstein, Mayer, Brown & Platt, Washington, DC, for amicus curiae.

Leo C. Salzman, Roger W. Hughes, Adams & Graham, Harlingen, TX, Gary Norton, Wood, Boykin & Wolter, Corpus Christi, TX, Frank E. Perez, Royston, Rayzor, Vickery & Williams, Brownsville, TX, Roger Townsend, James Sales, Fulbright & Jaworski, Houston, TX, Professor William Powers, Jr., Austin, TX, for appellants.

Chester Gonzalez, Brownsville, TX, Frank Costilla, Costilla & Stapleton, Brownsville, TX, David W. Holman, Holman & Hogan, Houston, TX, for appellees.

## OPINION

SEERDEN, Chief Justice.

In this products liability action, a jury awarded damages to appellees for injuries Cipriano Shears sustained while operating a Caterpillar model 920 multi-functional front-end loader. The jury found both Caterpillar and Holt strictly liable and negligent. The jury awarded compensatory and exemplary damages against Caterpillar and Holt. We reverse and render in part and affirm in part.

Cipriano Shears and Jesus Sanchez were employees of Dix Shipping Company, a stevedoring company with operations at the Port of Brownsville. Shears had operated heavy equipment for eighteen years. On February 28, 1988, Shears and Sanchez were each operating Caterpillar model 920 front-end loaders. They were working in a warehouse moving sodium sulphate—a powdery, white, crystalline salt, commonly called soap powder—from a conveyor to a storage pile until it could be shipped out. As was typical in this type of work, a lot of dust was flying around and visibility was limited. While both were moving soap powder in the warehouse, Sanchez's loader rear-ended Shears's loader. As a result, Shears suffered serious injuries.

Caterpillar manufactured the multipurpose model 920 with a rollover protective structure (ROPS) that was attached to the loader by twenty-four large bolts. The ROPS is a four-posted, cab-type structure that fits over the loader operator and is designed to protect the operator. The model 920 left Caterpillar's possession and was delivered to B.D. Holt with the ROPS attached to the loader. B.D. Holt sold the loader to Dix Shipping and the loader left its possession with the ROPS attached.

At some time before the accident on February 28, 1988, Dix Shipping removed the ROPS from both Shears's and Sanchez's loaders. The Shearses' expert testified that the model 920 loader with the ROPS attached was a reasonably safe machine.

According to the Shearses' theory of the accident, Sanchez could not see Shears unloading his sodium sulfate filled bucket onto the pile and drove his loader into the rear of Shears's loader. Sanchez's bucket pushed Shears's seat forward pinning Shears against the steering wheel.

Each model 920 loader is about 19 feet long and weighs about 18,000 pounds. The operator sits about 11 and ½ feet behind the front of the loader and bucket. Testimony showed that, because of the dust in the warehouse, Shears's loader was visible only from a distance of less than four feet.

### Failure To Warn

By Caterpillar's and Holt's second points of error, both claim that the evidence is legally and factually insufficient to support the jury's finding that a marketing defect existed in the model 920 that was a producing cause of Shears's injuries. Additionally, both appellants by their third points, claim that the evidence is legally and factually insufficient to support the jury's finding that Caterpillar and Holt were negligent.

The jury by answering question two, determined that there was a defect in the marketing of the model 920 at the time it left Caterpillar's and Holt's possession that was a producing cause of Shears's injuries. Additionally, the jury by answering question

three, determined that Caterpillar and Holt were negligent and that their negligence proximately caused Shears's injuries.

■ In reviewing an attack on the legal sufficiency of the evidence or a "no evidence" point, we consider only the evidence and reasonable inferences that tend to support the jury's findings, and disregard all evidence and inferences to the contrary. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.*, 774 S.W.2d 666, 668 (Tex.1989). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989).

■ In reviewing an attack on the factual sufficiency of the evidence, we consider, weigh, and examine all of the evidence which supports and which is contrary to the jury's determination. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989) (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex.1986)); *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986). Having done so, we should set aside the verdict only if the evidence standing alone is too weak to support the finding, or the answer is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

■ A product is unreasonably dangerous or defective when an ordinary man would not have marketed the product without "supplying warnings as to risks and dangers involved in using the product as well as instructions as to how to avoid those risks and dangers." *Blackwell Burner Co. v. Cerda*, 644 S.W.2d 512, 515 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.) (quoting *Technical Chemical Co. v. Jacobs*, 480 S.W.2d 602, 605 (Tex.1972)); *USX Corp. v. Salinas*, 818 S.W.2d 473, 482–85 (Tex.App.—San Antonio 1991, writ denied). A manufacturer can be found responsible through the doctrine of strict liability even though its product is faultlessly manufactured and designed, if the product marketed is unreasonably dangerous or likely to harm the user unless properly used. *Cerda*, 644 S.W.2d at 516. In such a case, the product would be unreasonably dangerous by virtue of the absence of adequate warnings. *Id.*

■ The manufacturer as well as the supplier has a duty to inform users of the hazards associated with the use of its product. *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 591 (Tex.1986). Additionally, the manufacturer must warn against foreseeable misuse and improper maintenance. *Cerda*, 644 S.W.2d at 516. A manufacturer who knows or should know of the potential harm to a user because of the nature of a product is required to give an adequate warning of such dangers. *American Cyanamid Co. v. Frankson*, 732 S.W.2d 648, 656 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.).

The evidence is undisputed that there were no warnings given by Caterpillar or Holt about any danger in operating the front-end loader without the ROPS. Mr. Shears testified that as an experienced operator he did not know or appreciate the dangers of operating a loader without a ROPS. He referred to it as a "cabin" and thought its purpose was to protect him from the heat and the cold. He testified that he did not know that the ROPS was there to protect him from injury, and did not know that it was dangerous to operate the loader without a ROPS. He said that if there had been a warning that the loader was dangerous without the ROPS he would not have operated it.

Mr. Sweeny, the Technical Support manager for Caterpillar, testified that it was likely that an owner or operator of a model 920 would take the ROPS off and not want to replace it.

Evidence was presented that the model 920 was dangerous if not used properly. Evidence was introduced that if the ROPS were removed from the loader it would become a dangerous piece of equipment. Wesley Buchele, the plaintiffs' expert witness, testified that it was his opinion that if the ROPS had been in place on the day of the accident that Shears would not have been injured. He stated that the operator's seat was 19 inches from the steering wheel. The ROPS was designed to withstand an overhead impact

two times the weight of the vehicle or 36,000 pounds. The ROPS was designed to withstand 10,800 pounds of horizontal force. Buchele explained that the ROPS was designed to give the operator protection whether it was "being impinged from the side, front, or back." The four-posted ROPS was designed to give the operator three-hundred and sixty degrees of protection. He testified that had the ROPS been in place, Shears would not have been injured.

Buchele also testified about the type of warning that should have been placed on the loader. Buchele stated that there should be two types of warnings on the model 920. He explained that one warning would alert the operator to the fact that this particular machine should not be operated without rollover protection. A second "formal type of warning" would set out the danger to the operator if the ROPS is removed. Buchele explained that he would have "Danger" in red letters. Under that he would include a pictorial stick-type drawing of someone being injured from the side. This pictorial drawing would show a loader without a ROPS and someone being injured by something intruding into the area which, if the ROPS were in place, would have protected the person. Additionally, he suggested that there be a warning "do not operate without ROPS in place" in two languages on several different places on the piece of equipment.

The warning would serve as a constant reminder that the equipment could cause serious physical injury. As noted in *Cerda,* the warning placed on a lawn mower calling attention to the user to not put a hand or foot close to the blades while the mower is in operation is not given so much as an instruction how to use the lawn mower but as a warning. It is common knowledge that serious injury will result if a hand or foot comes in contact with the blades while the mower is in operation. *Cerda,* 644 S.W.2d at 516. The primary purpose of the warning is the constant reminder that the mower can cause serious injury to the user.

■ Once a plaintiff proves that lack of an adequate warning renders a product unreasonably dangerous, his producing cause burden is aided by a rebuttable presumption.

The rebuttable presumption is that a user of a product would read a warning if one has been given. *Magro v. Ragsdale Bros., Inc.,* 721 S.W.2d 832, 834 (Tex.1986). This presumption may be rebutted with evidence that the user was blind, illiterate, intoxicated at the time of the product's use, irresponsible, lax in judgment, or by some other circumstance tending to show that the improper use would have occurred regardless of the proposed warnings or instructions. *Id.* (citing *Jacobs,* 480 S.W.2d at 606). Once a defendant offers evidence of circumstances tending to show that no warning would have been heeded, an issue of fact arises which can only be resolved by the fact finder. *Dresser Indus., Inc. v. Lee,* 880 S.W.2d 750, 753–54 (Tex.1993).

■ There is no evidence in the record that any of these conditions applied to Shears. Shears testified that he had been a heavy equipment operator for eighteen years. He explained that had he known that the model 920 was dangerous to operate without the ROPS he never would have operated it and that he would have reported the unsafe condition to the union.

Caterpillar and Holt presented evidence that none of the front-end loaders manufactured have warnings that say "do not operate this front-end loader without rollover protection." They argue that the dangers of operating the model 920 without the ROPS is open and obvious therefore they have no duty to warn concerning those types of risks. Additionally, Caterpillar and Holt presented testimony that Dix Shipping would have cut the ROPS posts off if the ROPS were manufactured in a way that it was not removable.

In the light of this evidence, it is impossible to substitute our opinion for the jury's as to what is commonly known to a "skilled operator" of such equipment. We cannot substitute our view for that of the factfinder about whether the dangers of injury without the ROPS are obvious as a matter of law. We overrule Caterpillar's points two and three and Holt's points two and three.

**Discretionary Evidentiary Rulings**

Appellants complain about several of the trial court's discretionary rulings. Appel-

lants complain about the admission of testimony from the appellees' only expert and the court's failure to grant a continuance. We briefly review the procedural history of the case.

The Shearses filed suit on February 21, 1990. Caterpillar propounded interrogatories to the Shearses in March 1990. By interrogatory fourteen, appellants asked that with regard to each expert, the Shearses describe in detail the subject matter about which the expert was consulted, the facts known to them, the authorities relied upon and the opinions or mental impressions held by each expert.

Trial was scheduled to begin August 26, 1991. On July 26, 1991, thirty-one days before trial was to begin, appellees by letter amended their answers to interrogatories and designated Buchele as a liability expert who would possibly testify at trial. The Shearses listed Buchele's name, address, and telephone number, and stated that he would testify and "discuss procedures utilized by Cipriano Shears and his fellow employees on the date of the accident as well as the Caterpillar front-end loaders being used at the time of the accident."

In mid-July, the parties filed an agreed motion for continuance because 1) the Shearses' attorney had recently associated in the case, and had not had ample opportunity to prepare for trial, 2) depositions of those responsible for the design of the removable ROPS had not been taken due to scheduling difficulties, 3) expert depositions had not been completed because the Shearses wanted to conduct corporate representative discovery, and 4) experts for the defense could not prepare the defense of the case until such time as they became aware of the opinions propounded by the Shearses' experts.

At a pretrial hearing on August 8, 1991, the trial court heard the motion. At the hearing, the judge stated that Mr. Shears had written a letter to him asking that the case not be delayed any longer. The Shearses' attorney at the hearing stated that because of his clients' position, he could no longer agree to the motion for continuance. Additionally, at the hearing, the Shearses' attorney stated that he intended to call Bu-

chele as his only liability witness at trial. The Shearses' attorney informed the court that Buchele's deposition was scheduled a week before trial. The trial court denied the continuance, asked that the parties try to get each others interrogatories answered, and stated it would reconsider the motion for continuance after Buchele's deposition. Another pretrial conference was held August 15, 1991, at which appellants again asserted their motions for continuance. Once again, the trial court denied the motions. Appellants took Buchele's deposition on August 19, 1991. Because trial was set to begin in a week, appellants again filed motions for continuances. Appellants requested more time to review the bases for Buchele's opinions which they had only learned about after attending his deposition. The court again denied the motions and trial commenced August 26, 1991.

### Admission of Buchele's Testimony

Appellants allege that the Shearses' response to appellants' interrogatory was not timely supplemented with the subject matter of Buchele's testimony as contemplated by civil procedure rule 166(b), and, therefore, the trial court was required by civil procedure rule 215(5) to exclude Buchele's testimony at trial.

 The admission of evidence is largely within the trial court's discretion. *Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 107 (Tex.1985); *Tracy's v. Annie's Attic, Inc.*, 840 S.W.2d 527, 531 (Tex. App.—Tyler 1992, writ denied). To determine whether the trial court abused its discretion, we determine whether the court's actions were arbitrary, capricious, or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex.1985). To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was in error and that the error was calculated to cause and probably did cause rendition of an improper judgment. *Boothe v. Hausler*, 766 S.W.2d 788, 789 (Tex.1989); Tex.R.App.P. 81(b)(1).

 When answering interrogatories regarding expert witnesses, a party must pro-

vide the substance of the testimony on which the party expects the expert to testify. Tex. R.Civ.P. 166b(6)(b). Full discovery of the mental impressions and opinions of experts before trial is of the utmost importance, and therefore, the offensive use of discovery mechanisms to conceal expert information defeats the salutary objective of discovery. *See Exxon Corp. v. West Texas Gathering Co.,* 868 S.W.2d 299, 305 (Tex.1993).

■ Although the supplemental answer to interrogatory fourteen, made thirty-one days before trial, was not a particularly detailed response we conclude that under the facts of the case it was adequate to put appellees on notice of the subject of Buchele's testimony. At the time of trial, the lawsuit had been on file for over four years. Appellants had this time to develop their defenses to the pleaded causes of action. Appellants presented a defense and rebutted Buchele's testimony at trial. Appellants and appellees took Buchele's deposition together shortly before trial. We also note that while both sides approached the trial court with an agreed motion for continuance asking that discovery continue a little longer before trial, the plaintiffs' letter to the trial court pleaded that after four years they wanted to go to trial. There is not sufficient evidence in the record to find that appellees attempted to conceal the substance of Buchele's expected testimony. We conclude that the trial court did not err by allowing Buchele to testify. We overrule Caterpillar's point six and Holt's point seven.

### Motion for Continuance

Caterpillar, by point seven, and Holt by point eight, assert that the trial court abused its discretion by denying their motions for continuance.

■ Whether to grant a motion for continuance is within the trial court's discretion. *Villegas v. Carter,* 711 S.W.2d 624, 626 (Tex. 1986). We will not disturb the trial court's ruling unless the record reflects a clear abuse of discretion. *Id.* We do not substitute our judgment for that of the trial court, but decide only whether the trial court's actions were arbitrary and unreasonable. *Yowell v. Piper Aircraft Corp.,* 703 S.W.2d 630,

636 (Tex.1986). Before we substitute our judgment, it should appear clearly from the record that there has been a disregard of the rights of a party. *Id.*

Appellants argue in a footnote that the trial court erred and abused its discretion when allowing Shears to "renege on his agreed motion for continuance." Appellants advance no other argument relating to this point of error. Given appellees' letter to the trial court appellees' attorney did not act improperly by withdrawing from the agreed motion for continuance. We conclude that the record does not disclose a clear abuse of discretion.

We overrule Caterpillar's point seven and Holt's point eight.

### Exclusion of Evidence

By point six, Holt asserts that the trial court erred by excluding evidence showing that Mr. Wilkinson, the Holt salesman who sold the model 920 to Dix Shipping, was acting outside the scope of his employment when he allegedly bought back the ROPS from Dix Shipping.

To obtain a reversal of a judgment based upon the exclusion of evidence, appellant must show that the trial court's determination was in fact error and, second, that the error was reasonably calculated to cause and probably did cause, the rendition of an improper judgment. *McCraw v. Maris,* 828 S.W.2d 756, 757 (Tex.1992); Tex.R.App.P. 81(b)(1). This determination is a judgment call entrusted to the sound discretion of the trial court. *McCraw,* 828 S.W.2d at 758. In determining whether the trial court erred, we review the entire record. *Id.* (citing *Gee v. Liberty Mut. Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989)).

■ The jury heard testimony from Mr. Ostos, the head of Dix Shipping, that Wilkinson was familiar with the fact that Dix unloaded shallow-decked ships. Ostos told Wilkinson that he did not want the ROPS attached to the 920 model he was purchasing.

Buchele testified that in reviewing Ostos' deposition, Wilkinson told Ostos when negotiating the sale of the 920 that he had to sell the model 920 equipped with the ROPS but that he would offer a buy back option. Bu-

chele understood from Ostos' deposition that after the ROPS was removed, Holt had a plan whereby Holt would buy back the ROPS and bring the ROPS back into Holt's inventory. Buchele explained that the ROPS was interchangeable from one model 920 to another. It was Buchele's understanding that Wilkinson bought back the ROPS from Ostos.

Carroll Vaughn, the service manager for Holt, testified that Holt would from time to time buy back equipment. Any equipment that was bought back was sent to him for condition inspection before being placed in Holt's used equipment inventory. He never saw any separate ROPS bought back by Holt. He recalled that he was involved in an investigation Holt conducted regarding Wilkinson's actions in September 1982. The investigation revealed that Wilkinson was taking traded-in equipment and reselling it on his own. Because of the facts revealed by the investigation, Holt terminated Wilkinson's employment.

Holt attempted to elicit testimony about the buy back plan and that Wilkinson had no authority to extend a buy back offer for the ROPS on behalf of Holt. The Shearses objected and claimed that Holt had not pleaded agency as an affirmative defense, therefore, any testimony about Wilkinson acting within or outside his scope of employment was improper. Holt responded that agency or scope of employment is not a defense that must be affirmatively pleaded.

The evidence Holt claims was improperly excluded was presented by two bills of exceptions relating to the alleged buy back plan. In its first bill of exception, Holt asked Ostos whether he knew who made the buy back arrangements. Ostos stated that he did not know whether Holt or Wilkinson was responsible for the buy back. Holt's second bill of exception was made with Carroll Vaughn. Vaughn testified that Wilkinson was never authorized to buy back any ROPS on behalf of Holt and to do so would be outside of his job duties.

We conclude that the exclusion of the evidence was within the trial court's discretion. Buchele's testimony was that Wilkinson bought back the ROPS. He did not testify that Holt bought back the ROPS. Evidence was admitted which showed that Wilkinson's employment with Holt was terminated in 1982 for arranging to buy back used equipment from Holt customers and then to resell the used equipment without Holt's authority. Therefore, there is evidence in the record that any arrangement to buy back the ROPS from Dix Shipping was not an arrangement with Holt. The trial court allowed testimony showing that Wilkinson was fired for representing to Holt customers that he would buy back used equipment and resell it. The jury could have inferred that his doing so was not within his authority as a Holt salesman. We conclude that the trial court's exclusion of the testimony was not an abuse of discretion. We overrule Holt's point six.

## Apportionment of Causation

Caterpillar, by its fifth point, and Holt by its fifth point, contend that the evidence is legally and factually insufficient to support the jury's determination of percentage of fault. Appellants' positions are that the findings that Caterpillar was 70% and Holt was 30% responsible for Shears's injuries were against the great weight and preponderance of the evidence.

We have reviewed the entire record. Both parties presented numerous witnesses and evidence concerning the cause of the accident. The question of fault between the appellants was thoroughly presented to the jury. We find the evidence sufficient to support the appropriation of liability. Caterpillar's and Holt's fifth points of error are overruled.

## Gross Negligence

By Caterpillar's point eight and Holt's point nine, appellants contend that the evidence is legally and factually insufficient to support the jury's finding that they were grossly negligent.

"Gross negligence" means more than momentary thoughtlessness, inadvertence or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected.

Tex.Civ.Prac. & Rem.Code Ann. § 41.001(5) (Vernon Supp.1994).

The recent case of *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10 (Tex.1994), contains a detailed discussion of gross negligence and provides guidelines for our standard of review of gross negligence findings.

Prior to *Moriel*, the case of *Burk Royalty Company v. Walls*, 616 S.W.2d 911 (Tex. 1981), was the leading authority in reviewing gross negligence findings. *Burk Royalty* expressly rejected the use of the "some care" test in determining legal sufficiency and reaffirmed that

In making this determination (existence of evidence of gross negligence), all evidence must be considered in a light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deducible from the evidence is to be indulged in such party's favor.

*Burk Royalty*, 616 S.W.2d at 922 (quoting *Harbin v. Seale*, 461 S.W.2d 591, 592 (Tex. 1970)); *Accord, Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

The *Burk Royalty* court observed that

In determining whether there is some evidence of the jury's finding of gross negligence, the reviewing court must look to all of the surrounding facts, circumstances, and conditions, not just individual elements or facts. At first glance there may appear to be some conflict in utilizing the traditional no evidence test and considering all the facts and circumstances to determine gross negligence. The *McPhearson* and *Harbin* cases indicate that the existence of gross negligence need not rest upon a single, act or omission, but may result from a combination of negligent acts or omissions, and many circumstances and elements may be considered in determining whether an act constitutes gross negligence. A mental state may be inferred from actions. All actions or circumstances indicating a state of mind amounting to a conscious indifference must be examined in deciding if there is some evidence of gross negligence. (citations omitted)

*Burk Royalty*, 616 S.W.2d at 922.

The argument before the *Moriel* court was that the traditional "no evidence" review, as directed in *Burk Royalty*, erodes that distinction between ordinary and gross negligence and that this type of review, which requires looking at evidence of carelessness in its most favorable light, is as favorable to punitive damage awards as the earlier "some care" test had been hostile to them.

In *Moriel*, the court states that gross negligence involves two components 1) the defendant's act or omission which must involve behavior that endangers the rights, safety, or welfare of the person affected and 2) the defendant's mental state. *Moriel*, 879 S.W.2d at 21. The *Moriel* court held that gross negligence therefore differs from ordinary negligence with respect to both elements—the defendant must be consciously indifferent and his or her conduct must "create an extreme degree of risk." *Id.* "Extreme risk" is a function of both the magnitude and the probability of the anticipated injury to the plaintiff. *Id.* The extreme risk prong is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *Id.*

The test for gross negligence contains both an objective and a subjective component. *Id.* Subjectively, the defendant must have actual awareness of the extreme risk created by his or her conduct. The defendant's subjective mental state can be proven by direct or circumstantial evidence. Objectively, the defendant's conduct must involve an extreme degree of risk. *Id.* This is a threshold significantly higher than the objective "reasonable person" test for negligence. *Id.* When determining one's state of mind relating to gross negligence we look to all of the evidence bearing on the individual's mental state.

Before a gross negligence finding can be sustained the evidence must show both that the act was likely to result in serious harm and that the defendant was consciously indifferent to the risk of harm. *Id.* at 22. What lifts ordinary negligence into gross negligence is the mental attitude of the defendant; that is what justifies the penal nature of the imposition of exemplary damages. *Hylander v. Groendyke Transp. Co.*,

732 S.W.2d 692, 694 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.). Conscious indifference denotes a decision, in the face of an impeding harm to another party, not to care about the consequences of the act which may ultimately lead to that harm. *Hylander*, 732 S.W.2d at 694. The plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he did not care. In evaluating legal sufficiency we are required to determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fairminded people to differ in their conclusions. *Moriel*, 879 S.W.2d at 25.

 Because the loader in this case is a multiuse product and certain operations could not be performed with a ROPS in place, Caterpillar designed the ROPS to be removable. The federal agency charged with the responsibility for workplace safety explicitly recognized that a ROPS can be removable to permit use of the loader in various work environments. Specifically, the Occupational Safety and Health Administration regulations authorize removal of the ROPS whenever a ROPS prevents the loader from entering work spaces so long as the operator cannot be injured by low overhead obstructions. With a nonremovable ROPS it would be impossible for a 920 model to function in low clearance areas—places where there is no danger of rollover and there continues to be danger of collision.

Dix Shipping purchased the model 920 because Dix needed heavy equipment to unload cargo in low clearance ship holds. Because the model 920's ROPS was attached with bolts, Dix could remove the ROPS and then replace the ROPS when not using the model 920 to unload ships with low clearances. A representative from Dix testified that the ROPS had not been replaced before using it for work in the warehouse because it was too much trouble.

A bolted ROPS is useful for other reasons. Evidence at trial showed that a front-end loader with a ROPS attached often exceeds the clearance afforded by bridges or other overpasses; furthermore, a ROPS must be removed to repair and remove component parts located under the operator's compartment. Also, in the event of a rollover or when the ROPS is damaged somehow, the damaged ROPS may be replaced with a new one rather than purchasing a new front-end loader.

Buchele testified that in his opinion Caterpillar's selling and designing a ROPS that could be removed was consciously indifferent to the workers that would be operating the machine. Buchele also testified that he had never heard of a similar type of accident. Buchele testified that the design objective when designing safety equipment was to try to provide maximum protection for the operator within the operator's console without regard to the exact mechanics of the injury. Buchele testified that having a removable ROPS increased the marketability of the loader but did not help in protecting the operator. Buchele also stated that when the ROPS was attached, "a skilled operator would understand that he or she has an environment, an envelope around the particular driver that would protect the driver from rollover, from collisions, and from falling objects," but that when the ROPS is removed, it is open and obvious that the protection for the operator is removed.

Mr. Eugene Sweeny, the corporate representative for Caterpillar at trial, testified that the ROPS provides a margin of safety to the loader operators. When the ROPS is removed the margin of safety is removed. He explained that the corporate policy with regard to safety equipment of Caterpillar is dictated by whatever the marketplace wants within reason. He continued that there are situations where regardless of what the marketplace wants the company builds what has to be there by law. He explained that the reason ROPS are standard equipment is because the marketplace wants them and because they provide protection to the user. ROPS are not standard equipment in Canada or Mexico because the marketplace does not want them. He agreed however that the risks of injuries to operators are the same regardless of the country the loader would be sold in.

Mr. Whitten, the sales manager for Holt's southern region, testified that the ROPS canopy, when used in conjunction with the seat

belt, also part of the standard equipment on the model 920, enhances the safety with which an operator can use the equipment both from the standpoint of impact-induced injuries and from the standpoint of rollover protection.

Whitten recalled that while working for Holt he had seen films about the dangers of impact associated with operating heavy equipment. The subject matter of these films was what happens when one piece of heavy equipment hits another piece of heavy equipment. One of the points of these films was that operators needed to be trained to take special precautions to make sure that operators avoided these types of collisions. The films were to make people aware that collisions needed to be avoided to try to reduce operator injury and equipment damage.

Mr. Staab, a retired Caterpillar employee, was in charge of Caterpillar's "proving ground" which is where the company tested front-end loaders and the ROPS. He testified that the ROPS provides protection under other circumstances when there is not actually a rollover, but a collision. He explained that Caterpillar designed the model 920 loader with the bolted ROPS for flexibility to help make the loader more desirable and to sell it. Caterpillar made the ROPS removable so that the model 920 could be used for different applications. One of the reasons Caterpillar designed their 920 with the removable ROPS was so that they could increase their share of the market by having a loader that could go into more confined areas which it otherwise could not.

Staab testified that he was aware that at construction sites where different pieces of equipment are being used in conjunction with one another, collisions could occur. He stated that Caterpillar was aware at the time of manufacturing the model 920 that collisions between heavy equipment could occur on a construction site.

Staab testified that in the absence of government regulations, the ROPS is not standard equipment. He also explained that the reason the ROPS were not standard equipment until the seventies was because of Caterpillar's belief that they were not necessary.

Caterpillar did not think that they were needed, and the customer did not think they were needed. Staab explained that the features that a manufacturer puts on his equipment are dictated by the customer.

As we review the asserted evidence of gross negligence, we note that Caterpillar knew that if the ROPS were removed that some protection to the operator would also be removed. Caterpillar also knew that the purchaser of a model 920 had to decide when to use the ROPS and when not to use the ROPS. However, none of this knowledge shows that Caterpillar and Holt were consciously indifferent to safety or to the rights of Shears. We find no evidence of Caterpillar's state of mind which would show that they acted with conscious indifference. Also, the Shearses' expert testified that he had not heard of any similar type of accident to this one.

We find no evidence that Caterpillar engaged in a course of conduct which disregarded the plaintiff's rights. The Shearses failed to establish such an entire want of care as to establish that the act or omission of using a bolted ROPS was the result of conscious indifference to the rights, safety, or welfare of Shears. The evidence does not support a finding of gross negligence.

Additionally, without regard to whether the model 920 was negligently designed by having a removable ROPS, there is no evidence of gross negligence in the design of the model 920 with a removable ROPS.

We sustain Caterpillar's point eight and Holt's point nine. We reverse the award of exemplary damages to the Shearses and render that they take no exemplary damages.

**Prejudgment Interest**

By Caterpillar's point twelve and Holt's point fourteen, appellants complain that the trial court erroneously awarded prejudgment interest on future damages. Appellants assert that the award of prejudgment interest violated appellants' right to due process under the federal and state constitutions.

In personal injury cases, prejudgment interest accrues on the amount of the judgment during the period beginning on the

180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered. Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 6(a) (Vernon Supp.1994).

■ The effect of this statute on future damages and due process rights was recently addressed in *C & H Nationwide Inc. v. Thompson,* 37 Tex.Sup.Ct.J. 1059, 1066, 1994 WL 278167 (June 22, 1994). The *Thompson* court noted and agreed with courts of appeals opinions that, because the statute makes no distinction between damages awarded in the judgment for past damages and damages awarded for future damages, parties are entitled to recover prejudgment interest on the future damages. *Id.*

The *Thompson* court, in addressing the right-to-due-process question, concluded that article 5069–1.05 section 6(a) did not violate a party's right to due process of law. *Id.* at 1069. The *Thompson* court recognized that compensating the plaintiff is not the only goal of prejudgment interest awards; they also serve the separate purpose of expediting settlements and trials. *Id.* In its constitutional, rational-relationship analysis, the *Thompson* court determined that allowing awards of prejudgment interest on the full amount of the judgment to promote settlements is not so unreasonable or oppressive as to be unconstitutional. *Id.* The *Thompson* court concluded that the scheme set out in article 5069–1.05 section 6 which encourages settlement does not exceed the Legislature's authority. *Id.* We overrule Caterpillar's point twelve and Holt's point fourteen.

We decline to address appellants' remaining points or error as they are not dispositive of the case. Tex.R.App.P. 90(a). We reverse the award of exemplary damages and render that no exemplary damages be recovered and affirm the remainder of the trial court's judgment.

Concurring and Dissenting Opinion by KENNEDY, J., joined by J. BONNER DORSEY, J.

Concurring and Dissenting Opinion by GILBERTO HINOJOSA, J.

KENNEDY, Justice, concurring and dissenting.

While I concur with the majority in its determination that no evidence supports the award of exemplary damages, I respectfully dissent from its determination that there is sufficient evidence against Caterpillar and Holt to impose actual damages. Though the majority sustains the finding of actual damages based upon sufficient evidence of a failure-to-warn cause of action, I conclude that there is insufficient evidence to support this cause of action as well as insufficient evidence to support a finding of strict liability, design defect, and negligence. I would reverse the trial court's judgment and render that the Shearses take nothing.

**Failure to Warn**

By Caterpillar's and Holt's second points of error, both claim that the evidence is legally and factually insufficient to support the jury's finding that a marketing defect existed in the model 920 that was a producing cause of Shears's injuries.

The Shearses argue that failure to warn users of risks involved in operating the front-end loader without a ROPS rendered the model 920 unreasonably dangerous. They contend that a conspicuous warning on the model 920 would have sufficed.

In Texas the existence of a duty to warn of the dangers or instruct about the proper use of a product is a question of law. *Joseph E. Seagram & Sons, Inc. v. McGuire,* 814 S.W.2d 385, 387 (Tex.1991). A manufacturer has no duty to warn a consumer of risks associated with the use of a product when those risks are "generally known and recognized" and are "within the ordinary knowledge common to the community." *Id.; see also Diggles v. Horowitz,* 765 S.W.2d 839, 842 (Tex.App.—Beaumont 1989, writ denied) (no duty to warn of risk associated with improper use of handgun, because "there is no duty to warn of hazards which are obvious or actually known"); *Beans v. Entex, Inc.,* 744 S.W.2d 323, 325 (Tex.App.—Houston [1st Dist.] 1988, writ denied) (no duty to warn of risk of asphyxiation from improper use of gas appliance, because "the seller's duty to warn

arises only where the dangers ... are such that a consumer cannot reasonably be expected to be aware of them"). A product is unreasonably dangerous and therefore defective if the ordinary man, knowing the risks and dangers involved in its use, would not have marketed the product without "supplying warnings as to the risks and dangers involved in using the product as well as instructions as to how to avoid those risks and dangers." *Bituminous Casualty Corp. v. Black & Decker Mfg. Co.*, 518 S.W.2d 868, 872 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r.e.).

Removal of a ROPS from a front-end loader takes away the protection that the ROPS provides to the operator. This is open and obvious to all. Indeed, the Shearses' expert conceded that, when the ROPS was attached, "a skilled operator would understand that he or she has an environment, an envelope around the particular driver that would protect the driver from rollover, from collisions, and from falling objects," but that when the ROPS was removed, it was obvious that the protection for the operator is removed.

> Since the warning is intended to be adequate for the "average user" of the product, the adequacy of the warning must be evaluated together with the knowledge of the ultimate users of the product. Where, for example, a product is marketed solely to professionals experienced in using the product, the manufacturer may rely on the knowledge which a reasonable professional would apply in using the product.

*Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 338 (5th Cir.1984) (applying Texas law). *Accord Gray v. Manitowoc Co.*, 771 F.2d 866, 871 (5th Cir.1985) (crane manufacturer under no duty to warn because risk of injury from being struck by boom understood by ordinary users of equipment, regardless of whether plaintiff himself understood the risk: "subjective ignorance has little significance for this objective injury"). The policy for requiring manufacturers to inform users of the risks inhering in their products is based upon the sound policy that the user is entitled to the information necessary to make an intelligent choice about whether the product's utility or benefits justify exposing himself to the risk of harm. *See Borel v. Fibreboard Paper Prod. Corp.*, 493 F.2d 1076, 1089 (5th Cir.1973) (applying Texas law); *see also Ellis v. Moore*, 401 S.W.2d 789, 793 (Tex. 1966).

Testimony at trial was that manufacturers like Caterpillar do not warn of dangers that are obvious or commonly known by skilled operators, such as the danger of collision; they are highly selective in the warnings. I conclude that the danger of collision and injury when operating a front-end loader without a ROPS is obvious as a matter of law.

I conclude that the judgment against Caterpillar based upon the failure to warn of the danger of collision and possibility of operator injury when the ROPS is removed based upon strict liability or negligence should be reversed. I would sustain Caterpillar's and B.D. Holt's second points of error.

**Design Defect**

Caterpillar and B.D. Holt, by their first points of error, assert that the evidence is legally and factually insufficient to support the jury's finding that the model 920 had a design defect that was a producing cause of Shears's injuries. Both appellants assert that the trial court erred by overruling their motions to disregard the jury finding, for j.n.o.v., and for new trial.

The Shearses claim that the loader was defective because purchasers could remove the ROPS and continue to operate the loader. At trial their design defect theory was that a risk of injury is associated with the operation of a front-end loader without a ROPS and, therefore, Caterpillar had a duty to design its model 920 in such a way that it would be impossible to operate the loader after removing the ROPS.

A manufacturer who sells a product in a defective condition that renders the product unreasonably dangerous is strictly liable for physical harm caused by the defect to the product's user even though the manufacturer "has exercised all possible care in the preparation and sale of his product." *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.

1967).[1] A product is "unreasonably dangerous" only if it is defective, whether designed defectively or improperly and produced as designed, or designed perfectly but improperly or defectively produced. *See Henderson v. Ford Motor Co.*, 519 S.W.2d 87, 92 (Tex. 1974).

Because many products have both utility and danger, the alleged defect is required to render the offending product "unreasonably dangerous" before strict liability is imposed.

Because the loader is a multiuse product and certain operations could not be performed with a ROPS in place, Caterpillar designed the ROPS to be removable by unbolting. The federal agency charged with the responsibility for workplace safety explicitly recognized that a ROPS must be removable to permit use of the loader in various work environments. Occupational Safety and Health Administration regulations authorize removal of the ROPS whenever a ROPS prevents the loader from entering work spaces so long as the operator cannot be injured by low overhead obstructions. With a non-removable ROPS it would be impossible for a 920 model to function in low clearance areas—places where there is no danger of rollover and there continues to be danger of collision. Testimony at trial showed that Dix purchased the model 920 because Dix needed heavy equipment to unload cargo in low clearance ship holds. Because the model 920's ROPS was attached by bolts, Dix could remove the ROPS and then replace the ROPS when not using the model 920 to unload ship holds with low clearances. The testimony showed that Dix had removed the ROPS on Shears's loader for use in unloading ships with low overhead clearances. A representative from Dix testified that the ROPS had not been replaced before using it for work in the warehouse because it was too much trouble.

A removable ROPS is useful for other reasons. Evidence at trial showed that a front-end loader with a ROPS attached often exceeds the clearance afforded by bridges or other overpasses; therefore, often, a ROPS must be removed to facilitate transporting a loader. Additionally, the ROPS often must be removed to repair and remove component parts located under the operator's compartment. Also, in the event of a rollover or when the ROPS is damaged somehow, the damaged ROPS may be replaced with a new one rather than purchasing a new front-end loader.

Appellants urge that the case before us is similar to *Hagans v. Oliver Machinery Co.*, 576 F.2d 97, 98 (5th Cir.1978) (applying Texas law). In *Hagans*, the plaintiff alleged that the defendant's industrial table saw was defectively designed and unreasonably dangerous because the blade guard attached to the saw was removable, rather than permanently welded to the saw. The defendant countered with evidence that the plaintiff's proposed design alternative "would substantially limit the saw's usefulness," particularly because "the safety device had to be removed in order to straight-out pieces of lumber of certain widths." *Id.* at 100. The Fifth Circuit reversed the jury's verdict in favor of the plaintiff, on "no evidence" grounds, holding that a manufacturer has no duty to design a multi-use product with a non-removable safety device that would seriously impair the intended, beneficial uses of the product.

In reversing the court noted,

[T]he company could have done as plaintiff suggests: permanently weld or rivet the blade guard assembly in place on the saw. In so doing, however, defendant would render his product incapable of performing many important woodworking functions that could be performed on saws marketed by his competitors.... By designing the saw with a removable blade guard, defendant struck a compromise that maximized the product's utility and safety.... Unfortunately, the nature of the industry is such that its tools, from the smallest tack

---

**1.** *McKisson* states that the defective condition must be a "proximate cause" of the injury, but the causation test currently applied is that the defective condition must be a "producing cause" of the injury or damage. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). A producing cause is "an efficient, exciting, or contributing cause, which in the natural sequence, produced injuries or damages complained of, if any." *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975).

hammer to the largest earth mover, expose certain risks of harm to their users.... The evidence is overwhelming that permanent attachment of the blade guard assembly would seriously impair the usefulness of defendant's product. Texas does not require a manufacturer to destroy the utility of his product in order to make it safe.... On the issue of defective design, the district court should have directed a verdict for defendant.

*Id.* at 101 (citing *Metal Window Prod. Co. v. Magnusen,* 485 S.W.2d 355 (Tex.Civ.App.— Houston [14th Dist.] 1972, writ ref'd n.r.e.)).

As with the industrial saw in *Hagans,* Caterpillar should not be required to destroy the utility of its front-end loader for low clearance operations merely to avoid the remote risk associated with an isolated use of a loader without a ROPS in circumstances where there is a minimal risk of a rollover. We note that testimony at trial showed that there have been no other incidents of Caterpillar front-end loaders colliding and operators sustaining injuries because a bolted ROPS had been removed.

The Caterpillar model 920 front-end loader is designed with a ROPS as a standard feature to provide rollover protection to the operator. The purchaser is in the best position to ensure that the ROPS is removed only under authorized conditions. Similarly, the ultimate purchaser is in the best position to decide whether the safety device was required for the type of work to be done. *See Elliott v. Century Chevrolet Co.,* 597 S.W.2d 563 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.) (upheld summary judgment for defendant because plaintiff's proposed safety device would be incompatible with many uses for which product was designed). Texas law does not require a manufacturer to destroy the utility of its product in order to make it safe. *See Magnusen,* 485 S.W.2d at 359.

I would employ the *Hagans* court's analysis and note that a finding for the Shearses on the issue of defective design ignores the fact that safety is not the only criterion a manufacturer considers when designing a product. *Hagans,* 576 F.2d at 101. When designing the front-end loader at issue, Caterpillar was faced with the difficult task of reconciling its safety concerns with the realities of a competitive marketplace. At one extreme, Caterpillar could have marketed a front-end loader without any ROPS. At the other extreme, Caterpillar could have done as the Shearses suggested: permanently welded the ROPS in place on to the front-end loader. In so doing, however, Caterpillar would have rendered its product incapable of performing many functions and would have required the purchaser to buy more specialized equipment rather than using the multipurpose model 920 properly.

Finally, Caterpillar, recognizing that potential customers expect to perform a wide range of functions with front-end loaders, elected a third option; equipping the front-end loader with a bolted ROPS. With this design the model 920 could perform the wide range of functions expected of it while providing the ROPS protection for those operations when rollovers are possible. By designing the bolted ROPS, Caterpillar struck a compromise that maximized the product's utility and safety.

Caterpillar installs a ROPS on all its front-end loaders sold in the United States as standard equipment to reduce the risk that a purchaser might fail to install a protective device for uses that involve a risk of a rollover. The ROPS, therefore, is installed on the front-end loader until the purchaser consciously decides that removal is necessary to perform essential commercial and industrial tasks. To subject Caterpillar to liability under the facts of this case would transform a manufacturer into an absolute insurer against risk of harm in the workplace. This would impermissibly contravene the strict tort liability established in Texas. *See Acord v. General Motors Corp.,* 669 S.W.2d 111, 114 (Tex.1984).

I conclude that as a matter of law the bolted ROPS was not a design defect that rendered the model 920 unreasonably dangerous. I would sustain Caterpillar's and B.D. Holt's first points of error.

### Negligence

Caterpillar and B.D. Holt, by their third points of error, contend that the evidence is

insufficient to support the jury's finding that they were negligent.

According to the Shearses' theory, if Caterpillar had welded the ROPS to its loader, Dix Shipping could not have removed the ROPS, and Shears would not have been injured. However, the testimony presented was to the contrary. Dix Shipping could have and would have removed the welded ROPS to make beneficial and necessary use of the loader in its business. Uncontroverted testimony was that a welded ROPS was removable. A Dix Shipping representative testified that if the ROPS were welded onto the loader he would have used a cutting torch to burn off the ROPS.

Like all other manufacturers of front-end loaders at the time, Caterpillar designed the ROPS with bolts so that the ROPS could be removed for effective use in appropriate circumstances. A removable ROPS was critical to the beneficial use of Caterpillar's loader for the purpose for which Dix Shipping originally purchased the loader.

Caterpillar cannot monitor an individual employer's decision that he is entitled under OSHA regulations to remove the ROPS for a particular operation—a decision that OSHA requires each employer to make based on the specific work environment in which the loader will be used. Under these circumstances, the employer is the only party in a position to ensure that a multi-use product is equipped with environment-specific safety features in circumstances where users may be exposed to a risk of harm. I would sustain Caterpillar's and Holt's third points of error. Because I conclude that there is no evidence to support any of the Shearses' causes of action, I would reverse the trial court's judgment and render that the Shearses take nothing.

Concurring and Dissenting opinion joined by J. BONNER DORSEY, J.

GILBERTO HINOJOSA, Justice, concurring and dissenting.

While I concur with the majority in its determination of the other issues in the case, I respectfully dissent from that portion of the Court's opinion which reversed the jury's award of punitive damages to the Shearses. I would find that there is sufficient evidence to support the award of exemplary damages and that the Shearses did satisfy the two-pronged test of *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10 (Tex.1994).

Under *Moriel*, gross negligence involves two components: 1) the defendant must have conscious indifference, or actual knowledge, of an extreme degree of risk and 2) the defendant's act or omission will likely cause a serious injury. *Moriel*, 879 S.W.2d at 21.

Wesley Buchele, the Shearses' expert witness, testified that, in his opinion, Caterpillar's selling and designing a rollover protective structure (ROPS) that could be removed was consciously indifferent to the workers who operate the machine. He testified that having a removable ROPS increased the marketability of the loader but did not help in protecting the operator. He also stated that had the ROPS been in place, Mr. Shears would not have been injured.

The majority opinion noted that Caterpillar knew that if the ROPS were removed the margin of safety provided by the ROPS was also removed. Despite this knowledge, neither Caterpillar nor Holt supplied any warnings regarding the danger of operating a loader without a ROPS. Mr. Shears, an experienced loader, testified that he did not know or appreciate the dangers of operating a loader without a ROPS. He stated that he would not have operated the loader had he been warned that the loader was dangerous. Mr. Shears did operate the loader without a ROPS and as a result suffered serious injuries from a collision with another loader.

Thus, I would find that there is sufficient evidence to establish gross negligence and I would affirm the award of exemplary damages to the Shearses.